IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 13, 2021

## STATE OF TENNESSEE v. DARNELL TRESHAWN WIGGINS

**Appeal from the Circuit Court for Maury County**
**No. 26130     Stella L. Hargrove, Judge**

_____

### No. M2019-02086-CCA-R3-CD

_____

A Maury County jury convicted the defendant, Darnell Treshawn Wiggins[1], of second degree murder, first degree felony murder, and kidnapping, for which he received an effective sentence of life imprisonment without the possibility of parole. On appeal, the defendant argues the evidence presented at trial was insufficient to support his convictions, the jury improperly weighed the aggravating and mitigating circumstances, and the State committed prosecutorial misconduct during its opening statement. The defendant also argues the trial court erred in admitting Officer Dalton's testimony during the penalty phase, in denying his motion for mistrial, and in denying his motion to dismiss for lack of a speedy trial. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Brandon E. White (on appeal) and S. Delk Kennedy (at trial), Columbia, Tennessee, for the appellant, Darnell Treshawn Wiggins.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Brent Cooper, District Attorney General; and Caleb Bayless, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

_____

[1] The defendant is also referred to as Darrnell Wiggins throughout the record.

The defendant was arrested on September 3, 2016, for the kidnapping and murder of his ex-girlfriend, Lacy Kelley.[2]  An indictment, which is not included in the record on appeal, was returned on November 16, 2016.  Following the appointment of counsel, the defendant filed a motion requesting a mental evaluation on January 31, 2017.  The defendant was subsequently admitted for an inpatient mental evaluation on July 6, 2017, and was found competent to stand trial on October 12, 2017.  Thereafter, a superseding indictment was obtained on November 15, 2017, which charged the defendant with first degree murder, first degree felony murder, and kidnapping.[3]

The defendant's case was initially set for trial on January 8, 2018.  However, because the defendant's first attorney was not aware the trial would be bifurcated, he requested a continuance to prepare for the penalty phase, and the trial was rescheduled for August 17, 2018.  On July 31, 2018, during a pre-trial hearing, the defendant's first attorney made an oral motion to withdraw, which the trial court granted.  The defendant's second attorney was appointed on September 4, 2018, and a new trial date was set for March 25, 2019.  On September 17, 2018, the defendant filed a motion to dismiss for lack of a speedy trial, and the trial court conducted a pre-trial hearing on October 5, 2018.

I.      *Motion to Dismiss*

In his motion to dismiss, the defendant argued that the two-year delay following his arrest created a presumption of prejudice, that he was not responsible for the delay, and that he had suffered actual prejudice.  In support of his motion, the defendant presented the following evidence at the pre-trial hearing.

Jerry Jones, the defendant's grandfather, testified that he visited the defendant in person and spoke with him on the phone during the two years the defendant had been incarcerated.  During that time, Mr. Jones noticed a change in the defendant's attitude, personality, and demeanor.  Although he did not describe any specific changes, Mr. Jones insisted the defendant was "not himself."

Christopher Wiggins, the defendant's father, testified via telephone.  While he was unable to visit the defendant in person at the jail, Mr. Wiggins testified he and the defendant spoke several times on the phone.  Mr. Wiggins stated the defendant seemed "mentally stressed out" because "his voice [was] not the same" and because he was not "as happy as he used to be."

---

[2] Because the defendant claims he was denied his right to a speedy trial, we will include numerous dates in the procedural history section of this opinion.

[3] The defendant was also charged with two counts of especially aggravated kidnapping, but those counts were later dismissed.

After its review, the trial court denied the defendant's motion to dismiss for lack of a speedy trial, finding that the reason for the two-year delay was not attributable to the State, that this was the first speedy trial motion filed by the defendant, and that the defendant did not provide any proof as to whether his case was prejudiced as a result of the delay. The defendant then proceeded to trial.

## II. Trial

### A. Guilt Phase

The evidence produced at trial showed the victim had previously been in a romantic relationship with the defendant beginning when she was fourteen years old, and the couple had two children together. However, at the time of the murder, the victim and defendant were not a couple, and the victim was dating someone else. Because the victim's four-year-old son, L.K., attended preschool in Columbia, he was living with the victim's aunt, Shelly Kelley, while the victim and her two-year-old daughter, M.W., lived with the victim's father, Wayne Kelley, in Giles County.[4]

On September 1, 2016, the victim and M.W. arrived at Ms. Kelley's residence around 7:30 p.m. to pick up L.K. for the weekend. At approximately 9:00 p.m., Mr. Kelley received a phone call from the victim, who was screaming and told her father that the defendant was "chasing her and ramming her" in an attempt to run her car off the road. Mr. Kelley advised the victim to pull into a nearby driveway while he called 911. When Mr. Kelley called the victim back, she screamed that "the car was on fire" and asked for "help [to] get the kids out of the car." Mr. Kelley testified he could not remember how his phone call with the victim ended.

Mark Stinnett had just gone to bed when his wife heard a noise outside their home. Mr. and Mrs. Stinnett went into their carport and heard voices but could not see anyone. When Mr. Stinnett turned the carport light off, he heard someone running near his driveway and a child or baby crying. Mr. Stinnett got into his vehicle, but by that time, the people he heard had driven away. Meanwhile, Mr. Stinnett's neighbor, William Jackson, was driving home and noticed a white SUV parked sideways in the road and a white car that had crashed in the woods. As Mr. Jackson drove past the cars, he saw the defendant slam the passenger door of the SUV before quickly driving away. Mr. Jackson and Mr. Stinnett went into the woods and saw a white vehicle with its lights on and doors open. Mr. Jackson noticed that the car has suffered rear damage and called 911. The following day, Mr. Stinnett's son discovered a cell phone on the ground near the area where the car had crashed, and Mr. Stinnett gave the phone to the police.

---

[4] It is the policy of this Court to refer to minors by initials only.

Dewayne Carte was watching television with his father at his home on Mooresville Pike when he heard someone outside screaming. The voice, which appeared to be coming from the trailers across the street, repeatedly screamed "please help me" and "my boyfriend's trying to kill me." As Mr. Carte walked toward the front door, the victim opened the door, entered the house, and laid down on the couch. The victim, who was wearing only a bloody shirt and sandals, was breathing hard and continually asked Mr. Carte to help her. Although Mr. Carte could not see any injuries on the victim, there were "numerous" holes in her shirt, which was "sopped in blood." Mr. Carte called 911 and retrieved some towels, which he used to wipe the victim's face and arm. While waiting for help to arrive, the victim took a "big gasp" and made "a little gurgle" before losing consciousness.

Officer Ryan Langhi with the Columbia Police Department ("CPD") responded to a report of a stabbing at Mr. Carte's residence. Officer Langhi was the first to arrive on the scene and approached Mr. Carte to inquire about the victim's condition. Mr. Carte indicated the victim was "pretty bad," and Officer Langhi saw that she was wearing only a yellow tank top, which was completely covered in blood. Officer Langhi attempted to ask the victim her name, but she was unable to answer.

Ty Adkisson was working as a paramedic at Maury Regional Medical Center on the night of the murder and responded to Mr. Carte's residence. Upon arriving at the scene, Mr. Adkisson observed the victim lying on a couch. Because the color of the victim's skin indicated she had lost a lot of blood, Mr. Adkisson immediately called for a medical helicopter, and the victim was loaded into the ambulance so that Mr. Adkisson and his partner could administer fluids until the helicopter arrived.

Deputy Patrick Ryan with the Maury County Sheriff's Department ("MCSD") arrived on the scene of the stabbing and began surveilling the area for the defendant, L.K., and M.W. Across the street from Mr. Carte's residence, Deputy Ryan observed three trailers. Deputy Ryan recalled "being [at one of the trailers] previously" when he was "looking for [the defendant]" in relation to "another incident." Deputy Ryan and CPD Officer Jennifer Dalton approached the trailer, and Deputy Ryan saw a cell phone on the front steps as well as several drops of blood. Deputy Ryan went to the back of the trailer, while Officer Dalton approached the front door.

Because the front door was ajar, Officer Dalton banged on the side of the trailer and announced her presence. She heard a child's footsteps running toward her, and L.K. opened the door. Officer Dalton picked up L.K. and carried him to a nearby field, where he informed Officer Dalton that M.W. was still inside. Officer Dalton left L.K. with another officer and returned to the trailer, where she discovered M.W. "cowered" under an

- 4 -

air conditioning window unit. Officer Dalton brought M.W. to the field and stayed with the children until they were released to a family member.

Lieutenant Jeremy Haywood with the CPD was tasked with securing a search warrant for the defendant's trailer. After returning to the trailer with the signed warrant, Lieutenant Haywood entered the residence and processed the scene. During his investigation, Lieutenant Haywood discovered what appeared to be blood droplets on the front steps, the stair railing, and the side of the trailer as well as a cell phone on the front steps. Inside the trailer, Lieutenant Haywood recovered bloody sheets from a bed in the master bedroom, a knife near the foot of the bed, several clothing items, and a large piece of carpet, all of which appeared to contain blood.

Sergeant Brandon Park with the MCSD was initially alerted to a possible car chase on Highway 31. As Sergeant Park and Deputy Joel Willoughby drove in the direction of the chase, they received an additional dispatch informing them of a vehicle crash on Neeley Hollow Road. Because the vehicle described in the second dispatch matched the description of one of the vehicles involved in the chase, Sergeant Park and Deputy Willoughby responded to the scene of the crash. Upon arrival, Sergeant Park spoke with Mr. and Mrs. Stinnett and Mr. Jackson and observed a white, four-door Buick with damage to the trunk and rear bumper area. Sergeant Park also noticed that several of the car's doors were open. Sergeant Park then received a third dispatch informing him of a stabbing on Mooresville Pike that was connected to the crash. Because of the urgency of the stabbing situation, Sergeant Park and Deputy Willoughby left the scene of the vehicle crash and headed toward Mooresville Pike.

Upon entering Mr. Carte's residence, Sergeant Park observed several fire and medical personnel gathered around the victim. As the victim was being placed in the ambulance, one of the firefighters alerted Sergeant Park that the victim had begun talking. Sergeant Park unclipped his body camera and gave it to Deputy Willoughby, who entered the ambulance and began speaking with the victim. When Deputy Willoughby asked the victim who "did this" to her, she said the defendant's name. The victim told Deputy Willoughby that she met the defendant at a skating rink that night because he wanted to see their children. According to the victim, the defendant "wanted [the victim] to go with him [but she] said no." The victim begged Deputy Willoughby not to "let [the defendant] take [her]," and Deputy Willoughby assured her that she was safe. The victim stated that the defendant had L.K. and M.W. and was driving a white Chevy Blazer. A copy of the body cam footage was entered into evidence.

Later that evening, Sergeant Park received a dispatch alerting him that the defendant was at a residence on Nashville Highway. When Sergeant Park arrived at the residence, additional officers and medical personnel were already on the scene. Two officers were

holding the defendant on the ground to prevent him from moving. The defendant was bloody and appeared to have a cut on his neck and wounds to his stomach. After the defendant was taken to the hospital, Sergeant Park secured the defendant's Blazer, which was parked in the driveway, and towed it to the MCSD impound lot.

Shelley Moses, a nurse practitioner at Vanderbilt University Medical Center, treated the defendant for three, "fairly minor," self-inflicted stab wounds. The defendant had one wound on his neck and one on each side of his abdomen, which Ms. Moses described as "superficial." Because the defendant was suspected of inflicting the wounds himself, he was evaluated by a psychiatric team, who made the final determination that the wounds were, in fact, self-inflicted.

Detective Marc Craig with the MCSD acquired a search warrant for the defendant's DNA as well as warrants for both the victim and the defendant's vehicles. Additionally, Detective Craig obtained warrants for the information from the air bag modules on the two vehicles and arranged for the Tennessee Highway Patrol ("THP") to obtain that information. Upon inspecting the defendant's car, Detective Craig discovered "partial damage" to the front bumper and what appeared to be "transfer from another possible white object." Additionally, the rear bumper of the victim's car appeared to have been hit "multiple times."

Detective Terry Dial with the MCSD interviewed the defendant on September 3, 2016, following the defendant's release from the hospital. When the interview began, the defendant was unaware that the victim had died but did not ask about the victim's condition or the welfare of his children. Approximately one hour and forty-five minutes into the interview, Detective Dial informed the defendant that the victim was dead, and the defendant became visibly upset and asked about his children.

Trooper Jamison Benefield, an expert in crash reconstruction with the THP, visited the site of the victim's crash and reviewed the crash data record ("CDR") collected from the defendant and the victim's vehicles. The CDR from the victim's vehicle showed that it was rear-ended while driving at a rate of forty-four miles per hour. However, the CDR from the defendant's vehicle did not appear to contain data from the night of the crash.

Dr. Feng Li, an expert in forensic pathology and the chief medical examiner for Metropolitan Nashville and Davidson County, performed the autopsy on the victim. Dr. Li testified the victim suffered eight stab wounds. The first stab wound was five inches deep and entered the victim's left breast, cutting through the heart. The second stab wound was also to the left breast, but because it was only two inches deep, the knife did not enter the chest cavity. The third stab wound was to the middle of the victim's chest. This wound was two inches deep and limited to the chest wall. The fourth stab wound entered the right

side of the victim's abdomen and was six inches deep, injuring the liver. The fifth stab wound was to the right lower abdominal wall and did not injure the internal organs. The sixth stab wound was in close proximity to the fifth wound and was superficial in nature. The seventh stab wound was to the left upper arm with no evidence of injury to the deep tissue. The eighth stab wound was to the right wrist area. The knife entered the back of the wrist and went through the victim's arm, exiting through the front wrist. Dr. Li opined this wound was defensive in nature and would be consistent with someone holding their hands up. Dr. Li also observed several superficial slash wounds on the victim where the knife did not penetrate the victim's body, as well as hemorrhaging near the skull, left posterior rib cage, and esophagus. Dr. Li opined the stab wound to the victim's heart was sufficient to cause death, and the wound to the victim's liver was "potentially fatal" without medical intervention.

Special Agent Charly Castelbuono, a DNA analysis expert with the Tennessee Bureau of Investigation ("TBI"), analyzed several pieces of evidence found at the crime scene, including the defendant's tennis shoes and t-shirt, a baseball hat, women's blue underwear, women's pink underwear, a blue bra, a pink tank top, a pair of jeans, the bra and sandals worn by the victim, a shirt found on the defendant's bed, a knife, bedsheets, and swabs and carpet samples taken from the scene. Her examination of the knife's blade tested positive for blood and the DNA profile was consistent with a mixture of two individuals. Although the major contributor profile matched the defendant, the minor contributor profile was inconclusive. The handle of the knife contained a mixture of at least three individuals, one of which was male. The defendant's t-shirt and one carpet sample contained both the victim and the defendant's blood. The shirt found on the bed, baseball hat, pink underwear, blue underwear, blue bra, pink tank top, jeans, bedsheets, ten swabs, four carpet samples, and the victim's bra and sandals revealed the presence of the victim's blood. Several of the items analyzed by Agent Castelbuono either did not reveal the presence of blood or the DNA profile was too limited to conclusively determine the contributor.

The defendant declined to present evidence. Following deliberations, the jury found the defendant guilty of second degree murder, first degree felony murder, and kidnapping.

### B. Penalty Phase

Jessica White, a counselor at Kid's Place Child Advocacy Center, testified that L.K. began attending counseling in 2016 and that she became his counselor in June 2018. When L.K. first began counseling, he was unable to eat and experienced nightmares. He also reported being afraid of the defendant and became upset if he saw a white SUV like the defendant's. Ms. White testified that L.K. has not directly acknowledged whether he

witnessed the events that occurred on September 1, 2016, and becomes avoidant if she brings it up.

Mr. Kelley testified he has been in constant pain following the victim's death. Mr. Kelley raises the victim's children and ensures they receive counseling to help them process their grief. Mr. Kelley testified that L.K. is afraid of the dark and is worried about the defendant "getting out." Mr. Kelley also testified L.K. told him that "his daddy stabbed his mama" and "ran them off the road." Additionally, M.W. does not like to ride in the backseat of a vehicle by herself and is afraid of being in another car wreck. Mr. Kelley described the victim as "a loving person" who "worked two jobs to make sure her kids had what they needed."

Officer Dalton testified that when L.K. opened the door to the defendant's trailer, he immediately told her that "[his] daddy tried to kill [his] mommy" and asked Officer Dalton if "[his] mommy [was] going to die." Officer Dalton brought L.K. and M.W. to a nearby field and waited with them until they were released to family members. While waiting for relatives to arrive, L.K. told Officer Dalton that "daddy had crashed their car and that mommy hit her head and she was bleeding and that daddy grabbed mommy by her hair and drug mommy."

In mitigation, the defense called Mr. Jones, the defendant's grandfather, who testified that he had attended every day of the trial. Each day, Mr. Jones approached the defendant, and the defendant told Mr. Jones that he loved him.

Following deliberations, the jury imposed a sentence of life imprisonment without the possibility of parole for the defendant's conviction for first degree murder. The parties reached an agreement regarding the defendant's sentences for the remaining convictions. In accordance with that agreement, the trial court sentenced the defendant to twenty-five years for the second degree murder conviction and six years for the kidnapping conviction. The trial court merged the murder convictions and ordered the defendant to serve his sentences concurrently, for an effective sentence of life imprisonment without the possibility of parole. The defendant filed a motion for new trial, which the trial court denied. This timely appeal followed.

### *Analysis*

On appeal, the defendant contends the trial court erred in denying his motion to dismiss for lack of a speedy trial, in denying his motion for mistrial, and in admitting Officer Dalton's testimony during the penalty phase of the trial. The defendant also argues the evidence presented at trial was insufficient to support his convictions, the State committed prosecutorial misconduct during the penalty phase of the trial, the jury erred in

weighing the aggravating and mitigating circumstances, and cumulative error warrants a new trial.

## I.       Speedy Trial[5]

The defendant argues his right to a speedy trial was violated. Specifically, he claims the thirty-month delay between his arrest and trial was unnecessary and caused a negative change in his attitude, personality, and demeanor. The State responds that the trial court properly denied the defendant's motion to dismiss for lack of a speedy trial.

Criminal defendants are "entitled to a speedy trial" under both the United States and Tennessee Constitutions and Tennessee statutory authority. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Tenn. Code Ann. § 40-14-101; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). The trial court may dismiss an indictment if "unnecessary delay occurs in . . . bringing a defendant to trial." Tenn. R. Crim. P. 48(b)(2). To determine whether a speedy trial violation has occurred, the trial court must balance the factors outlined in *Barker v. Wingo*, which include: the length of delay, the reasons for delay, the defendant's assertion of the right to a speedy trial, and the prejudice resulting from the delay. 407 U.S. 514, 530-32 (1972); *see State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001) (adopting the *Barker* test in Tennessee). Dismissal is warranted if the trial court finds a defendant has been denied a speedy trial under the *Barker* analysis. *Barker*, 407 U.S. at 522. This Court reviews the trial court's determination regarding whether the defendant's right to a speedy trial was violated for an abuse of discretion. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App.1996)).

When looking at the first *Barker* factor, we note that a one-year delay or longer triggers an inquiry into a speedy trial violation. *Id.* at 667. The State concedes that there was a thirty-month delay between the defendant's arrest and trial. This factor weighs in favor of the defendant.

The second *Barker* factor, the reason for the delay, usually falls into one of the following categories:

   (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant;

   (2) bureaucratic indifference or negligence;

---

[5] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the defendant's brief.

(3) necessary delay for the fair and effective prosecution of the case; and

(4) delay agreed to or caused by the defendant.

*State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996). "Delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned." *Vermont v. Brillon*, 556 U.S. 81, 94 (2009). Because the pre-trial delay in this case was caused by the defendant's first appointed counsel, the defendant concedes the second factor weighs in favor of the State.

While not required, a defendant's assertion of his speedy trial right is "entitled strong evidentiary weight." *Barker*, 407 U.S. at 531. The failure to assert the right will ordinarily make it difficult to prove that the right has been denied. *Id.* The defendant asserted his right to a speedy trial in September 2018, and the trial was held in March 2019. Thus, this factor weighs in favor of the defendant.

Finally, we consider the prejudice to the defendant caused by the delay, in light of the interests protected by the speedy trial right. *Barker*, 407 U.S. at 532. The defendant contends he experienced "significant anxiety" due to the pre-trial delay which caused a "negative change in [his] attitude, personality, and demeanor." While we can assume the defendant did experience some anxiety about the charges, nothing in the record suggests that the anxiety was caused by the pre-trial delay or that the defendant's ability to present his defense was impaired. Therefore, the prejudice factor weighs in favor of the State.

After considering all of the *Barker* factors, we conclude that the defendant's right to a speedy trial was not violated and that the trial court did not abuse its discretion in allowing the case to proceed to trial. The defendant is not entitled to relief on this issue.

## II. 404(b)/Motion for Mistrial

The defendant argues the trial court erred in denying his requests for a mistrial following the testimony of Mr. Kelley, Deputy Ryan, and Officer Dalton. The defendant contends the three statements referenced a prior bad act which prejudiced the defendant's right to a fair trial. The State responds that the unsolicited testimony about the defendant's criminal history did not warrant a mistrial.

During his testimony at trial, Mr. Kelley made the following statement:

Well, [the defendant] called, texted [the victim] or called [the victim] and wanted to meet the kids. Said he was going to turn himself in and he wanted to see the kids.

The defendant did not make a contemporaneous objection but requested a jury-out hearing at the conclusion of Mr. Kelley's testimony and requested a mistrial, explaining that a curative instruction would simply call more attention to the statement. The State assured the trial court that all of its witnesses had been instructed not to mention the fact that the defendant had an outstanding warrant at the time of the murder. The State noted that Mr. Kelley did not speak loudly or clearly and that the jurors did not seem surprised by any of his testimony. The trial court found that the testimony did not rise to the level of mistrial but instructed the State to ensure the subject was not discussed by other witnesses.

During Deputy Ryan's trial testimony, the following exchange occurred:

PROSECUTOR: Do you recall whether or not you had identified the trailer that ultimately [became] a crime scene yet?

DEPUTY RYAN: I did. I'd recalled being there previously for another incident. And after I had gotten the name, I recalled going [to] that location looking for that individual.

Again, the defendant did not contemporaneously object, but requested a jury-out hearing at the conclusion of Deputy Ryan's testimony and renewed his motion for a mistrial, contending the cumulative effect of Deputy Ryan and Mr. Kelley's testimonies warranted a mistrial. The State argued that Deputy Ryan did not name the defendant as the individual he was looking for and the incident Deputy Ryan described did not allege any prior criminal activity. The trial court again admonished the State to talk to its witnesses about not mentioning the defendant's prior criminal history. However, because the trial court did not find that the testimony rose to the level of manifest necessity, the motion for mistrial was denied.

During Officer Dalton's trial testimony, she testified that she was given the defendant's address in connection with the victim's missing children and stated that she "was familiar with the address." Following her testimony, the trial court took a recess and the defendant again renewed his request for a mistrial, arguing that, while Officer Dalton's statement alone was not objectionable, the three statements together were enough to influence the jury. The State argued that nothing in Officer Dalton's testimony indicated why she was familiar with the defendant's address, and the trial court denied the motion for mistrial.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id.* This Court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion, we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

In applying these factors to the present case, we first note that the State did not elicit any of the challenged testimony. While Mr. Kelley, Deputy Ryan, and Officer Dalton's statements occurred during the State's direct examination, the statements were not responsive to the State's questions. Secondly, although the trial court did not give a curative instruction following any of the statements, the defendant did not request an instruction. Notably, following Mr. Kelley's testimony, trial counsel stated that he thought "an instruction would be not helpful." The defendant has, therefore, waived consideration of this factor. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987) (holding the failure to request a curative instruction constituted a failure to nullify the harmful effect of improper testimony). Finally, the case against the defendant was strong. The victim called her father and told him that the defendant was trying to run her off the road. She later appeared at Mr. Carte's home, which was across the street from the defendant's trailer, suffering from multiple stab wounds. In the ambulance, the victim told Deputy Willoughby that the defendant had stabbed her, and the victim's blood was discovered throughout the defendant's trailer and on the defendant's clothing.

Because all three factors weigh in favor of the State, we conclude the defendant has not established the "manifest necessity" required for a mistrial. Thus, the trial court did not abuse its discretion in denying the defendant's request for a mistrial, and the defendant is not entitled to relief on this issue.

## III. Sufficiency

The defendant contends the evidence is insufficient to support his convictions. He asserts, generally, that the State failed to establish his intent during the offenses. He

likewise argues relative to the first degree felony murder and kidnapping convictions that the State provided no proof that the defendant forced the victim into his trailer or that the trailer was locked while the victim was inside. Therefore, the defendant argues the jury was forced to speculate during their deliberations. The State responds that the evidence is sufficient.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Second Degree Murder

Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a "result of conduct" offense, meaning that the statute focuses "on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000).

Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000). "'Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.'" *State v. Bonds*, 502 S.W.3d 118, 145 (Tenn. Crim. App. 2016) (quoting *Inlow*, 52 S.W.3d at 105).

In the light most favorable to the State, the evidence shows the victim appeared at Mr. Carte's front door, bloody and wearing only a shirt and sandals. The victim told Mr. Carte that the defendant was "trying to kill [her]." As the victim was being placed into an ambulance, she told Deputy Willoughby that the defendant was the person who had stabbed her. Dr. Li testified the victim suffered eight stab wounds, including a fatal wound to her heart. Additionally, Agent Castelbuono testified the victim's blood was found on the defendant's clothing.

Although the defendant argues the State offered no proof of the events leading up to the victim's death, and as such, the jury was forced to speculate as to the defendant's intent, intent "may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *Inlow*, 52 S.W.3d at 105. Here, the nature of the assault was such that a rational jury could conclude the defendant was aware his conduct, stabbing the victim eight times, was reasonably certain to cause the victim's death. Accordingly, we conclude the evidence presented was sufficient to sustain the defendant's conviction for second degree murder, and the defendant is not entitled to relief on this issue.

## B.    Kidnapping

Kidnapping is defined as "false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a).

Viewing the evidence in the light most favorable to the State, the victim called her father and told him that the defendant was trying to run her off the road before the victim's car crashed near Mr. Stinnett's house. When Mr. Stinnett's wife heard people talking outside, Mr. Stinnett went to investigate and heard someone running nearby and a baby crying. Mr. Jackson was driving past the scene of the crash and observed the defendant shut the passenger door of his SUV before driving away. Later, when the victim was in the ambulance, she told Deputy Willoughby that she met the defendant at a skating rink because he wanted to see their children. She also stated that the defendant "wanted [the

- 14 -

victim] to go with him, [but she] said no." Finally, the victim repeatedly begged Deputy Willoughby not to "let [the defendant] take [her]." Based on this evidence, a rational jury could find kidnapping beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

## C.      First Degree Felony Murder

The defendant was convicted of first degree felony murder committed in the perpetration of kidnapping. As charged in this case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping. Tenn. Code Ann. § 39-13-202(a)(2). Kidnapping is defined as "false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." *Id.* § 39-13-303(a). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a).

Because the evidence is sufficient to support the defendant's conviction for kidnapping and because the evidence shows the defendant killed the victim during the perpetration of a kidnapping, the evidence is likewise sufficient to support his felony murder conviction. The defendant is not entitled to relief on this issue.

## IV.      Improper Vouching

The defendant asserts the prosecutor improperly vouched for the seriousness of this case in relation to other murder cases he had tried. The State concedes the prosecutor made a brief statement impliedly vouching for the State's case but contends the statement was harmless error.

The established test for determining whether prosecutorial error based on improper comments amounts to reversible error is whether the conduct was so improper, or the argument so inflammatory, that it affected the verdict. *See State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005); *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). In assessing whether comments made by the prosecution are so inflammatory or improper as to affect the verdict, the court must consider five factors:

(1) The conduct complained of viewed in the context and the light of the facts and circumstances of the case;

(2) The curative measures undertaken by the court and the prosecution;

(3) The intent of the prosecutor in making the improper statements;

(4) The cumulative effect of the improper alleged conduct and any other errors in the record; and

(5) The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also *Goltz*, 111 S.W.3d at 5-6.

During his opening statement in the penalty phase of the trial, the prosecutor made the following statement:

> And I can tell you that the State's position won't surprise you. We filed a request for life without parole as a possible sentence in this case. And we did that because we feel this case warrants it. This isn't just your everyday homicide.
>
> I have tried a lot of homicides, this is the first one I have ever asked for life without – I take that back, the second one that I have asked for life without parole.
>
> This case involves a murder that should have never happened. It's especially bad because it occurred in front of the two very young children of [the victim] and [the defendant]. And that [the defendant] carried out this murder with absolute callous[ness]. Because of his actions, the State feels that at any stage in his life, [the defendant] should be removed from society.

Although the defendant did not contemporaneously object to the prosecutor's statements regarding the seriousness of the case, he requested a mistrial following the conclusion of the opening statements. Trial counsel argued the prosecutor's statements implied that this was a "big, big case" and more important than other murder cases the State had tried. The trial court disagreed, finding that the prosecutor commented about the seriousness of the crime because the murder was committed in front of the children and not because it was more important or "bigger" than other cases.

We conclude that despite the theme that "this [wasn't] just your everyday homicide," the prosecutor's argument was limited to explaining why the jury should sentence the defendant to life without parole. When viewed in the context of the entire opening statement, the prosecutor's comments about the seriousness of the offense were based on the callous nature of the murder and the fact that the defendant murdered the victim in front of their children. Moreover, in light of the proof presented by the State, any

- 16 -

potentially prejudicial effect is outweighed by the evidence in this case. The State provided both the dying declaration of the victim implicating the defendant as well as DNA evidence linking the defendant to the crime. Moreover, the trial court instructed the jury to follow the law, not the opinions of the attorneys, and we presume the jury followed those instructions. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The defendant is not entitled to relief on this issue.

## V. Relevancy of Officer Dalton's Testimony

The defendant argues the trial court erred in allowing Officer Dalton to testify during the penalty phase regarding L.K.'s statements about the murder. Specifically, the defendant contends the probative value of her testimony was "miniscule at best" because the State had already proven the presence of the aggravating circumstance. Accordingly, he argues the testimony was "little more than an appeal to the emotions of the jurors." The State responds that the trial court properly admitted Officer Dalton's relevant testimony.

Prior to the penalty phase of the trial, the defendant objected to the inclusion of Officer Dalton's testimony, arguing that the testimony was not a victim impact statement and that the jury had already found beyond a reasonable doubt the only aggravating circumstance alleged by the State: [t]he murder was knowingly committed by the defendant, while the defendant had a substantial role in committing or attempting to commit any kidnapping. Tenn. Code Ann. § 39-13-204(i)(7). Therefore, according to the defendant, "[n]o further proof [was] needed." Trial counsel agreed to stipulate to the kidnapping aggravating circumstance, but the prosecutor declined. The trial court rejected the defendant's argument, finding "[t]he State has to prove [the aggravating circumstance] here at this hearing" and allowing Officer Dalton's testimony for the purpose of establishing the aggravating circumstance. During the penalty phase, Officer Dalton testified regarding her interactions with the victim's children immediately following the murder, specifically L.K.'s assertion that "[his] daddy had crashed their car and that [his] mommy hit her head and she was bleeding and that [his] daddy grabbed [his] mommy by her hair and drug [her]."

The defendant maintains the trial court abused its discretion in admitting Officer Dalton's testimony because it was cumulative to evidence presented at the guilt phase and because trial counsel had offered to stipulate to the kidnapping aggravating circumstance. As an initial matter, we note that trial counsel's offer to stipulate to the aggravating circumstance did not diminish the probative value of Officer Dalton's testimony under the sentencing statute the way it might during the guilt phase. *See State v. Odom*, 336 S.W.3d 541, 566 (Tenn. 2011). Moreover, Tennessee Code Annotated section 39-13-204(c) provides for the admission of evidence on "any matter that the court deems relevant to the punishment," including "any evidence tending to establish or rebut the aggravating

- 17 -

circumstances . . . regardless of its admissibility under the rules of evidence." Although a trial court may use the Tennessee Rules of Evidence as guidance during the penalty phase of a capital murder trial, the Rules of Evidence "should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." *State v. Sims*, 45 S.W.3d 1, 14 (Tenn. 2001).

Here, Officer Dalton's testimony was relevant to establishing the kidnapping aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(i)(7). Her testimony was brief, and the contested statements from L.K. had not been admitted during the guilt phase. Accordingly, we conclude the trial court did not abuse its discretion in allowing the State to introduce the testimony. The defendant is not entitled to relief on this issue.

## VI.    Weighing of Aggravating and Mitigating Circumstances

The defendant contends the mitigating circumstances submitted to the jury outweighed the aggravating circumstance established by the proof. Specifically, the defendant asserts (1) he was in an extreme mental or emotional state at the time of the murder; (2) he was twenty-two years old when the murder was committed; and (3) he was in a state of extreme remorse immediately following the murder. The State contends the jury reasonably sentenced the defendant to life imprisonment without the possibility of parole.

"[W]hether mitigation exists and the weight given aggravating and mitigating circumstances are issues within the province of the jury." *State v. Mann*, 959 S.W.2d 503, 512 (Tenn. 1997) (citing *State v. Barber*, 753 S.W.2d 659, 669 (Tenn. 1988)). We will not curtail the jury's role in weighing the aggravating and mitigating circumstances. Accordingly, we conclude the evidence is sufficient to support the jury's finding that the aggravating circumstance outweighed any mitigating circumstances presented by the defendant beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

## VII.    Cumulative Error

Finally, the defendant contends the cumulative effect of the errors alleged above entitles him to a new trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Because the defendant has not established any error, he is not entitled to relief under the cumulative error doctrine.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE